Matthew J. Preusch (SBN 298144)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, California 93101
(805) 456-1496, Fax (805) 456-1497
mpreusch@kellerrohrback.com

Lynn Lincoln Sarko, *pro hac vice* forthcoming
Derek W. Loeser, *pro hac vice* forthcoming
Gretchen Freeman Cappio, *pro hac vice* forthcoming
Alison S. Gaffney, *pro hac vice* forthcoming
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: (206) 623-1900
Fax: (206) 623-3384
lsarko@kellerrohrback.com
dloeser@kellerrohrback.com
gcappio@kellerrohrback.com
agaffney@kellerrohrback.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| KEITH PRESTON, on behalf of himself and all others similarly situated,<br><br>         Plaintiff,<br><br>  v.<br><br>WELLS FARGO & COMPANY AND WELLS FARGO BANK, N.A., D/B/A WELLS FARGO DEALER SERVICES,<br><br>        Defendants. | No. 3:17-cv-4346<br><br>**COMPLAINT<br>CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................... 3

III.    INTRADISTRICT ASSIGNMENT....................................................................... 4

IV.     PARTIES .............................................................................................................. 4

V.      FACTUAL ALLEGATIONS ............................................................................... 5

        A.      Wells Fargo Forced-placed Hundreds of Thousands of Unnecessary Auto
                Insurance Policies. ................................................................................... 5

        B.      Wells Fargo's Deceptive Practices Regarding CPI Led to Increased Fees,
                Interest, Delinquencies, and Repossessions........................................... 7

        C.      Wells Fargo Knew or Should Have Known it was Forcing Insurance on
                Customers Who Neither Needed nor Wanted Insurance .......................... 8

        D.      Plaintiff Preston's Experience ................................................................. 9

        E.      Other Online Complaints ......................................................................... 9

VI.     ANY APPLICABLE STATUTES OF LIMITIATION ARE TOLLED ....................... 13

        A.      Discovery Rule...................................................................................... 13

        B.      Fraudulent Concealment ....................................................................... 13

        C.      Estoppel................................................................................................. 13

VII.    CLASS ACTION ALLEGATIONS ................................................................... 14

VIII.   CAUSES OF ACTION ...................................................................................... 16

        A.      The Auto Insurance Enterprise ............................................................. 19

        B.      Conduct of the Auto Insurance Enterprise........................................... 22

        C.      Wells Fargo and National General's Pattern of Racketeering Activity ............. 23

        D.      Damages Caused by Defendants' Auto Insurance Enterprise ............... 27

IX.     REQUEST FOR RELIEF ................................................................................... 28

X.      DEMAND FOR JURY TRIAL ......................................................................... 29

Plaintiff Keith Preston, on behalf of himself and all others similarly situated nationwide, files this Class Action Complaint against Defendants Wells Fargo & Company, a Delaware Corporation, and Wells Fargo Bank, N.A., a National Banking Association, doing business as Wells Fargo Dealer Services (collectively "Wells Fargo," "the Bank" or "Defendants'). Plaintiff states the following based on information and belief and investigation of counsel:

## I.     INTRODUCTION

1.     Hours after the *New York Times* reported on yet another scandal at Wells Fargo, in which the Bank charged borrowers astonishing amounts of money for unneeded and unwanted insurance on auto loans, Wells Fargo admitted it had cheated its customers out of millions of dollars. Wells Fargo does not dispute that for nearly a decade, in coordination with National General Insurance, it forced hundreds of thousands of borrowers to pay for unnecessary and expensive auto insurance. In a rare moment of candor, Wells Fargo stated "We take full responsibility for these errors and are deeply sorry for any harm we caused our customers."

2.     Wells Fargo's *mea culpa* rings hollow. Wells Fargo, while vowing to "make things right" in the wake of its recent scandal over unauthorized bank accounts, was apparently hoping this unlawful practice could slip by unnoticed. Wells Fargo admits it knew, at least in 2016 if not far earlier, that the Bank had forced unwanted and unneeded insurance on customers for years. Despite knowing of this shocking practice in 2016, it did not bother to alert its customers or "make things right" then. Several months later, at congressional hearings over its fraudulent account practices, Wells Fargo continued to hide its unlawful auto loan practices. Even at its Investor Day in May 2017, when its executives spoke at length about the ways Wells Fargo was working to "make things right," Wells Fargo said not a word about the problem of forced-placed auto insurance.

3.     Only when the *New York Times* broke the story, on July 27, 2017, and Wells Fargo could no longer hide its unlawful forced-insurance program, did it belatedly acknowledge its illegal

practices—hurriedly issuing its own announcement and its plan for unilateral, insufficient "remediation" a few hours after the story was published. Wells Fargo even took out banner ads, including in the newspaper that broke the story, trying to spin the scandal into positive press:



4.     Wells Fargo's efforts amount to too little, too late. The extent of Wells Fargo's scheme is staggering. According to an independent consultant's report prepared for Wells Fargo executives, more than 800,000 people who took out car loans from Wells Fargo between January 2012 and July 2016 were charged for auto insurance they did not need or want. Wells Fargo unilaterally added expensive insurance policies to its customers' auto loans even when those customers had already obtained their own insurance and provided proof to Wells Fargo.

5.     In addition, Wells Fargo frequently added these policies to its customers' loans without notifying them. Without notice, many customers did not realize that they were being charged for unnecessary insurance, because their monthly payments were automatically deducted from their accounts.

6.     And, when customers discovered Wells Fargo had forced unneeded insurance on them, Wells Fargo routinely refused to remove the policy or refund past payments.

7.     Furthermore, Wells Fargo structured its payment system in order to maximize the interest that customers would pay over the life of the loans, on both the original loan amounts and the unnecessary insurance premiums.

8.      Wells Fargo's forced-placed insurance scheme earned it millions of dollars in interest payments, penalties, fees, and "commissions" or "kickbacks" from National General Insurance. But the costs of this scheme caused serious and lasting harm to Wells Fargo's customers. Not only did customers pay astronomical sums of unnecessary insurance premiums, but the expense of the unnecessary insurance, as well as additional interest and/or resulting fees and penalties, also pushed approximately 274,000 of those customers into delinquency and led to almost 25,000 wrongful vehicle repossessions. This has severely damaged the credit of many Wells Fargo customers.

9.      Wells Fargo's auto lending practices echo the practices of its retail banking division, whose employees would add unwanted secondary accounts to primary accounts without permission and manipulate fee-generating customer accounts through unfair, fraudulent, and unlawful means.  Here, too, Wells Fargo is signing its customers up for a product they neither requested or needed.

10.     Wells Fargo's abusive auto insurance practices have caused significant stress, hardship, and financial losses for its customers.  For example, Plaintiff, who has been charged for unnecessary and unwanted CPI since 2008, has likely paid thousands of dollars by now for duplicative auto insurance to Wells Fargo.

## II.      JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are 100 or more Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendants, a substantial portion of the alleged wrongdoing occurred in this District and California, and Defendants have sufficient contacts with this District and California.

13. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District.

### III.   INTRADISTRICT ASSIGNMENT

14. This case is properly brought in the San Francisco Division of the Northern District of California. Pursuant to Local Rule 3-2(c), cases are to be filed in the Division "in which a substantial part of the events or omissions which give rise to the claim occurred." Defendant Wells Fargo & Company has its principal place of business in San Francisco. Wells Fargo's consumer banking website lists the address of the bank's "Corporate Offices" as 420 Montgomery Street, which is less than two miles from this Court.

15. As Plaintiff alleges that Defendants have engaged in illegal activity related to Plaintiff's auto loan, and that such illegal activity was pursuant to nationwide policies, a substantial part of the events or omissions about which Plaintiff complains took place at Defendants' offices in San Francisco. Thus, pursuant to Local Rule 3-2(d), the proper venue for this case is the San Francisco Division of the Northern District of California.

### IV.   PARTIES

16. Plaintiff Keith Preston is currently a resident and citizen of Nevada, and at times relevant to this complaint was a resident and citizen of California.

17. Defendant Wells Fargo & Company is incorporated in Delaware with its principal place of business in San Francisco, California. Wells Fargo & Company is a financial services company with $2 trillion in assets, and provides banking, insurance, investments, mortgage, and consumer and commercial finance through more than 8,500 locations, 13,000 ATMs, and the Internet. It has approximately 273,000 full-time employees, and is ranked 25th on Fortune Magazine's 2017 rankings of America's 500 largest corporations.

18.     Defendant Wells Fargo Bank, N.A. is a national banking association chartered under the laws of the United States with its primary place of business in Sioux Falls, South Dakota. Wells Fargo Bank, N.A. provides Wells Fargo & Company personal and commercial banking services, and is Wells Fargo & Company's principal subsidiary.

19.     Wells Fargo & Company is the largest bank headquartered in California. Wells Fargo Bank, N.A., doing business as Wells Fargo Dealer Services, provided the auto lending services that are the subject of this action.

## V.     FACTUAL ALLEGATIONS

20.     Wells Fargo Dealer Services is Wells Fargo's auto lending business and part of its Consumer Lending division.  Most of its auto lending business is indirect: dealer-originated loans then purchased by Wells Fargo.  But Wells Fargo is also in the business of providing direct auto loans to consumers, with a $2.2 billion portfolio.  As recently as the first half of 2016, Wells Fargo was the nation's second largest provider of auto loans.

21.     Beginning as early as 2006, Wells Fargo Dealer Services required its direct auto loan customers to have comprehensive and collision auto insurance for the vehicle that was the subject of the loan.  If the customer did not have such insurance or did not provide evidence of it, Wells Fargo purchased it for the customer, at the customer's expense.  Wells Fargo referred to this as Collateral Protection Insurance ("CPI").

**A.     Wells Fargo Forced-placed Hundreds of Thousands of Unnecessary Auto Insurance Policies.**

22.     The practice of lender-placed insurance is relatively common with residential mortgages, but is uncommon with auto loans.  After all, nearly every driver in the United States is already required to have insurance, and as a result most customers financing their car purchases are already covered under their existing car insurance policies.

23.     Nevertheless, when a customer financed a vehicle through Wells Fargo, Wells Fargo would send the customer's information to National General Insurance, who underwrote the CPI policies for Wells Fargo.

24.     National General was supposed to check a database to determine if the customer had vehicle insurance coverage.  If not, National General would impose coverage on the customers' cars, and include the costs of the insurance in the customer's auto loan.

25.     As noted above, nearly every car purchaser already has auto insurance for their newly purchased cars. In practice, however, Wells Fargo and National General imposed coverage on customers' cars even though customers already had vehicle insurance coverage. As a result, Wells Fargo's customers were forced to pay for insurance they neither needed nor wanted.

26.     Wells Fargo benefitted handsomely when it forced insurance policies on its customers. Not only did it get to charge interest on the insurance premiums, but also, at least through 2013, Wells Fargo received commissions for every insurance policy "sold" to its customers.

27.     Even in the relatively rare instances where a purchaser did not already have car insurance, Wells Fargo's secret decisions to force insurance on its customers were unlawful. Federal law requires insurers to provide information regarding CPI to borrowers before a loan can be issued. And many states have insurance regulations requiring Wells Fargo to notify customers of the CPI before it was imposed.  But Wells Fargo often failed to provide this required information.  For example, Wells Fargo's consultants reportedly found that between 2012 and 2016, almost 100,000 CPI policies violated the disclosure requirements of five states—Arkansas, Michigan, Mississippi, Tennessee and Washington.

28.     As a result, many customers did not realize, or did not realize until much later, that Wells Fargo had sold them unnecessary and expensive auto insurance.

29.     Moreover, when customers, like Plaintiff here, did realize that they were being charged for unnecessary insurance (and corresponding interest) and contacted Wells Fargo to request cancellation of the policy and reimbursement, Wells Fargo frequently refused to fix the problem.

**B.      Wells Fargo's Deceptive Practices Regarding CPI Led to Increased Fees, Interest, Delinquencies, and Repossessions.**

30.     Wells Fargo's failure to disclose the forced CPI policies led to increased fees and greater interest charged to customers. In some cases, these significant additional costs caused some customers to become delinquent on their loans and resulted in the wrongful repossession of customers' vehicles.

31.     For example, customers often arranged for their monthly loan payments to be deducted automatically from their bank accounts. When Wells Fargo forced an insurance policy on the car, the monthly payments grew significantly above the expected monthly payments. Because customers were often unaware that Wells Fargo had forced them to purchase expensive insurance and rolled the insurance premiums into the loan amount, their accounts could easily become overdrawn as a result of an increase in the automatic deduction. Once their accounts were overdrawn, customers suffered the additional damages of overdraft fees and penalties.

32.     Wells Fargo also maximizes its profits, and exacerbates its customers' damages, by structuring loan payments to the Bank's advantage. When customers make their monthly loan payments, Wells Fargo applies the payments in sequential order designed to maximize the interest charged to each customer over the life of the loan.  On a website titled "Understanding your auto loan," Wells Fargo listed the sequential order as follows:

(1)     Loan interest — the daily interest amount due on your loan

(2)     Collateral Protection Insurance (CPI) interest — the amount of interest on your insurance premium (if applicable)

(3)     Principal — the principal payment amount due on your loan

(4)     CPI principal — the principal payment on your insurance premium (if applicable)

(5)     Payment variance — any amount remaining due from previous payment

(6)     CPI variance — any amount remaining due from previous insurance premium

payment (if applicable)

(7)     Other charges — fees such as nonsufficient funds

*See*
https://www.wellsfargodealerservices.com/Consumers/FinancialEducation/UnderstandingYourAutoLoan/default.asp

33.     Because fewer dollars went to reducing the principal, this payment structure had the effect of increasing the overall interest borrowers paid on their loans—and increasing delinquencies and repossessions.

**C.     Wells Fargo Knew or Should Have Known it was Forcing Insurance on Customers Who Neither Needed nor Wanted Insurance**

34.     In response to the *New York Times* article exposing Wells Fargo's unlawful practices, Wells Fargo has argued that, at worst, it simply failed to adequately monitor its business partner, National General. It has claimed that National General, not Wells Fargo, improperly identified customers as being without insurance, and argued that National General is to blame for the unlawful imposition of the policies.

35.     This cannot be true. First, Wells Fargo knew that the vast majority of people in the United States already have car insurance. Thus, the sheer number of insurance policies it was forcing on its customers would have alerted the Bank to the underlying problem. Second, Wells Fargo was intimately involved in forcing the policies on its customers; it wrapped insurance premiums into the loans, it received commissions for each policy it "sold," and it collected interest on the price of the policy. Third, as explained below, Wells Fargo received numerous and repeated complaints from its customers about the forced insurance.

36.     Wells Fargo directly participated in the creation of a joint project to unlawfully impose insurance on its customers and withhold critical and legally required information from its customers.

**D.     Plaintiff Preston's Experience**

37.     In 2008, Plaintiff Preston financed a car purchase through Wells Fargo's predecessor company.  At that time, he was required to show proof of insurance before he could drive the car off the lot.  In early 2009, Wells Fargo Dealer Services took over his loan from the predecessor company.

38.     After Wells Fargo took over, Plaintiff Preston noticed a significant increase in his monthly payment.  When he contacted Wells Fargo to ask the reason for the increase, he was told it was for car insurance.

39.     Plaintiff Preston provided Wells Fargo with proof of his existing insurance policy by having his insurance agent call and fax in the proof Wells Fargo required.  But, Wells Fargo continued to bill him for CPI.  Plaintiff Preston made numerous calls to Wells Fargo informing Wells Fargo of his existing car insurance policy and objecting to Wells Fargo's duplicative policy.

40.     Nonetheless, Wells Fargo refused to remove the CPI charge from his loan statement.  On information and belief, Plaintiff Preston paid thousands of dollars in duplicative auto insurance to Wells Fargo.

**E.     Other Online Complaints**

41.     While Plaintiff's experiences may sound egregious, a review of online complaints against Wells Fargo shows the practices they experienced are widespread.  For example, Wells Fargo customers provided the following accounts on ConsumerAffairs.com:

**Taisha** of Jacksonville, FL on
Sept. 22, 2016

*Satisfaction Rating*



I have an auto loan with Wells Fargo that is almost paid off. So we thought. I switched Insurance companies on 01/01/2016. We have been with Geico for almost a year now. Wells Fargo has been adding Insurance to our auto loan at the rate of 125.00 per month. Which we were not informed of. Although we already had coverage. They came to repo our car yesterday saying we were behind. They said we owe the 125.00 and now late fees on the 125.00 because they have been paying it (Adding it to the loan).

I am floored, I have never heard of such a thing. When we called them out on it they said they would refund one month since we are no longer driving the car. So when I asked for all the documentation for our account for our family attorney to review they said they have no information or details they can give at this time. They said we will have to pay the fees owed then they can go back and apply credits later. I am still in shock. I can't believe a company can do this to hard working americans. We are out $1125.00 /$125.00 per month since January. Plus late fees and towing fees. Is this legal? Help? Any suggestions??

Updated on 12/20/2016: I previously made another inquiry on 9/27/16. Our car was repossessed for non payment. Wells Fargo was adding insurance to our loan. The payment was an extra 125.00 per month. We already had Insurance with Geico. So it looked as if we were not making the whole payment. Long story short we were credited amount owed back to the loan. But they would not release the car back to us unless paid off in full. They wanted us to pay for repo and storage fees.

## Consumer Complaints and Reviews

 Nicole of Suffolk, VA on Nov. 14, 2016

Satisfaction Rating 

I can relate to Taisha of Jacksonville, FL on how Wells Fargo will increase the monthly car payment loan for insurance coverage. I've had my car for over a year now and have experienced nothing but headache after headache dealing with this company. Just like another person stated up here, I purchased my car from a shady car dealership and had nothing but trouble mechanically and financially. How can you increase the monthly payments without even notifying the owner of the vehicle first? Then after you prove you have insurance still be charged for the insurance coverage after being told "Once it has been proven the insurance coverage is effective the insurance coverage will be removed from the account and your payments will go back to the normal monthly payment."

Now Wells Fargo dealer services is stating I never had coverage from the time I left the dealership until I recently switched insurance companies. So my monthly payments will be new amount to cover the time when I didn't have coverage (supposedly). I have read over my entire loan and have yet to see anything that remotely states that will happen if I do not have insurance coverage. I had to deal with a car that has been in the shop most of the time (I wish I never went to that dealership) now to paying more money a month for the stupid non-working car to a company that hopefully will close!!!

*See* https://www.consumeraffairs.com/finance/wells-fargo-auto-loans.html?page=2

42.    On the Consumer Financial Protection Bureau's online complaint database, Wells Fargo customers provided the following accounts:

07/26/2016:   After paying our car loan with Well fargo Dealer Service XXXX CA for the month of XXXX XXXX we receive[d] a call that stated that our payment was still outstanding because they had applied some insurance to our auto loan. We explained to the representative that we have always carried ins with XXXX XXXX without lapses. She state[d] it was a[n] easy fix and for us to call the insurance company to have them send over proof of insurance which we did the same day and call back the next day to be sure it was taken care of. The rep assure[d] us that all the charges would be remove. and because this was an error it would not be reported on our credit (This was very important because we were in process of getting a home loan and needed our credit to remain constant). However, on XXXX XXXX XXXX we find that Well Fargo have placed a 30 day late report on our credit that caused our credit to fall XXXX points and our chance for the American Home Dream to slip away. When we called to ask what happen to this very simple correction they gave us several excuses and apologize only to say it would take them 30 to 45 days to correct after we submit a written dispute, again prove ins, send

copies of credit reports and show credit when down before they would take this off of our credit reports. We have fought very hard to restore our credit and have waited 7 years after a for[e]closure to bring up our credit and to be able to buy a home again, only to have a big bank come along and wipe out our chances without concern for their error or the detriment that it cause hard working, bill paying American families. Any help you can offer in expediting this credit restoration would be very appreciated Thank you in advance for your assistance.

**11/09/2015**:  Wells Fargo Dealer Services has contin[u]ously overcharged for the auto loan on my 2006 XXXX and kept me uninformed about details of my loan and its terms. 1 ) I just found out from a wells fargo dealer services representative that I was assessed/enrolled in comprehensive auto insurance through the Auto dealer XXXX at the time of the purchase as part of the re[q]uirement to qualify for the loan..At the time of the purchase I was not informed of this requirement. I was al[s]o asked to get a second comprehensive insurance for the duration of the loan which I also purchased independently. In essence I was asked to carry XXXX insurance policies on the same auto. 2 ) In reviewing my loan payments it appears my interest rate on the loan was raised without any notification. Wells Fargo Dealer Services reps have been extremely rude when inquir[]eing about my loan issues and very unco[o]p[e]rative with information about the details of the loan and its terms. 3 My car was repos[s]essed after only one month late on my loan payments. Fees and char[]ges for repossession, storage and penalties appear to be exce[s]sive. 4.Wells Fargo continues to charge for auto insurance ( wells fargo insurance ) even though I have comprehensive insurance on the my veh[i]cle and have notified them of it. . If and where there have been deliberate overcharging and exploitation I want a refund on the overcharges and exce[s]sive fees.

**04/09/2015**: I am a single mother of XXXX who has been a loyal Wells Fargo customer for over 15 years. My loyalty stems from the fact that my family and I have XXXX accounts with Wells Fargo which is why I decided to use the Wells Fargo Dealer Services car loan service rather the other options that I had when I purchased my car in XX/XX/XXXX. . . Here is the brief about this case below : XXXX XXXX, Collections Manager is charging me for insurance when I already carry insurance through XXXX. This is a scam to steal funds from me! . . . I was surprised when my credit bureau report shows that I was reported late for late payment even though I had been paying my usual payment without including the Wells fargo added insurance since XXXX XXXX said it was taken care of[]. . . .  In the mean time my credit worthiness is under attack and my FICO score has dipped negatively. The incorrect credit report needs to be corrected ; the late fees need to be removed ; and the harassing phone calls need to be stopped- XXXX XXXX continues to call me and that needs to stop!

43.    In sum, Wells Fargo has engaged in a long-running and widespread pattern of unlawful behavior that has harmed Plaintiff and others like him.

## VI.     ANY APPLICABLE STATUTES OF LIMITIATION ARE TOLLED

**A.     Discovery Rule**

44.     Plaintiff and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that Wells Fargo and National General were engaged in a nationwide practice of charging auto loan customers for unnecessary CPI policies.

45.     Plaintiff and Class members had no realistic ability to discover the existence of this scheme, or to otherwise learn of Wells Fargo's fraudulent behavior, until it was reported by the *New York Times* on July 27, 2017 because the paper had somehow received access to an internal Wells Fargo report.

46.     Any otherwise-applicable statutes of limitation to any claims asserted herein have thus been tolled by the discovery rule.

**B.     Fraudulent Concealment**

47.     All applicable statutes of limitation have also been tolled by Wells Fargo's knowing, active and ongoing fraudulent concealment of the facts alleged herein.

48.     Wells Fargo has known of its scheme to unlawfully charge its customers for unnecessary and duplicative auto insurance at least since 2006.

49.     Despite knowing about their unlawful and fraudulent behavior for this entire period, Wells Fargo did not acknowledge the problem to the public, and in fact actively concealed it, until after the New York Times published the exposé and forced Wells Fargo's hand.

50.     Any otherwise-applicable statutes of limitation have therefore been tolled by Wells Fargo's exclusive knowledge and concealment of the facts alleged herein.

**C.     Estoppel**

51.     Wells Fargo was, and is, under a continuous duty to disclose to Plaintiff and Class members the true nature of its relationship with National General. Instead, Wells Fargo actively

concealed the nature of its arrangement with National General, which allowed Wells Fargo to profit

from commissions for each policy "sold" to National General until at least 2013, and from additional

interest on the premium amount.

52.     Plaintiff and Class members reasonably relied upon Wells Fargo's active concealment of

these facts.

53.     Based on the foregoing, Wells Fargo is estopped from relying on any statutes of

limitation in defense of this action.

### VII.    CLASS ACTION ALLEGATIONS

54.     This matter is brought by Plaintiff on behalf of himself and those similarly situated, under

Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

55.     The Class that Plaintiff seeks to represent is defined as follows:

> All persons in the United States who financed vehicles through Wells Fargo Dealer
> Services and were charged for duplicative Collateral Protection Insurance.

56.     **Numerosity/Impracticability of Joinder:** The members of the Class are so numerous

that joinder of all members would be impractical. The proposed Class likely contains tens or hundreds of

thousands of members. The precise numbers of members can be ascertained through discovery, which

will include Defendants' loan records and other records.

57.     **Commonality and Predominance:** There are common questions of law and fact that

predominate over any questions affecting only individual members of the Class.

58.     For Plaintiff and the Class, the common legal and factual questions include, but are not

limited to the following:

> A.     Whether and how Wells Fargo engaged in unlawful practices in order to sell its
>
> auto loan customers unnecessary insurance;

B.     Whether Wells Fargo knew or should have known that National General Insurance failed to adequately confirm the existence of customers' independent collision coverage;

C.     Whether Wells Fargo omitted and/or concealed material facts from its communications and disclosures to Plaintiff and the Class regarding its Collateral Protection Insurance policies;

D.     Whether Wells Fargo has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices with its practices regarding Collateral Protection Insurance policies;

E.     Whether Wells Fargo violated California and/or other states' consumer protection statutes;

F.     Whether Wells Fargo violated the federal statutes enumerated in the causes of action below;

G.     Whether Wells Fargo has been unjustly enriched;

H.     Whether, as a result of Wells Fargo's conduct, Plaintiff and the Class have suffered damages; and if so, the appropriate amount thereof; and

I.     Whether as a result of Wells Fargo's misconduct, Plaintiff and the Class are entitled to equitable and declaratory relief, and, if so, the nature of such relief.

59.     **Typicality:** The representative Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all the members of the Class have been injured by the same wrongful practices of Wells Fargo. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.

60.     **Adequacy:** Plaintiff is a representative who will fully and adequately assert and protect the interests of the Class, and has retained class counsel who are experienced and qualified in

prosecuting class actions. Neither Plaintiff nor his attorneys have any interests contrary to or in conflict with the Class.

61.     **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are likely in the millions of dollars, the individual damages incurred by each Class member are too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Further, individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and the court system because of multiple trials of the same factual and legal issues. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Wells Fargo has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

62.     Plaintiff does not anticipate any difficulty in the management of this litigation.

63.     Wells Fargo has, or has access to, address and/or other contact information for the members of the Class, which may be used for the purpose of providing notice of the pendency of this action.

## VIII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
Asserted on Behalf of Plaintiff and the Class
**Violations of California's Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq.***

64.     Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

65.     California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, protects both consumers and competitors by promoting fair competition in commercial markets for goods and services. California's Unfair Competition Law is interpreted broadly and provides a cause of action for any unlawful, unfair, or fraudulent business act or practice. Any unlawful, unfair, or fraudulent business practice that causes injury to consumers falls within the ambit of California's Unfair Competition Law.

66.     Wells Fargo engages in substantial sales and marketing of its financial products and services within the State of California.

67.     Wells Fargo's acts and practices, as described herein, constitute unlawful, fraudulent, or unfair business practices, in that (1) Wells Fargo's practices violate numerous statutes as described in this Complaint; (2) the justification for Wells Fargo's conduct is outweighed by the gravity of the consequences to Plaintiff and the Class members; (3) Defendants' conduct is immoral, unethical, oppressive, unconscionable, or substantially injurious to Plaintiff and Class members, and/or; (4) the uniform conduct of Wells Fargo has a tendency to deceive Plaintiff and Class members.

68.     Wells Fargo's unlawful, unfair, and fraudulent business acts and practices, as described above, include, but are not limited to, wrongfully charging its auto loan customers for unnecessary insurance coverage, refusing to cancel unnecessary insurance coverage despite proof of existing coverage, failing to notify customers of the imposition of insurance coverage, structuring payments in order to maximize the amount of interest customers would be charged, and wrongfully sending accounts to collections and repossessing vehicles.

69.     Plaintiff and Class members have been damaged by these practices.

70.     Wells Fargo's conduct, as described herein, violates California's Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and other similar state unfair competition and unlawful business practice statutes.

**SECOND CAUSE OF ACTION**
**Asserted on Behalf of Plaintiff and the Class**
**Violation of Racketeer Influenced and Corrupt Organizations Act ("RICO"),**
**18 U.S.C. § 1962(c)-(d)**

71.     Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

72.     Plaintiff brings this Count on behalf of himself and the Class against Defendants for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq.*

73.     At all relevant times, Defendants have been "persons" within the meaning of 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

74.     Plaintiff and the members of the Class are each "persons," as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Defendants' wrongful conduct.

75.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

76.     Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

77.     As explained in detail below, Defendants sought to extract millions of dollars of revenue from Plaintiff and the Class through the fraudulent issuance of unnecessary and unauthorized CPI

policies in connection with the application and issuance of Wells Fargo auto loans. Defendants' years-long misconduct violated sections 1962(c) and (d).

**A.     The Auto Insurance Enterprise**

78.     RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.  *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

79.     Wells Fargo and its co-conspirator National General Insurance formed such an association-in-fact enterprise, sometimes referred to herein as the "Auto Insurance Enterprise." The Auto Insurance Enterprise consists of: (a) Wells Fargo, its subsidiaries, employees, and agents; and (b) National General Insurance, its subsidiaries, employees, and agents. This association-in-fact enterprise was formed for the purpose of extracting profits from Plaintiff and the Class through the fraudulent issuance of unauthorized CPI policies, as described herein.

80.     At all relevant times, each member of the Auto Insurance Enterprise was aware of the enterprise's conduct, was a knowing and willful participant in that conduct, and reaped profits from that conduct.

81.     While each member of the Auto Insurance Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs, at all relevant times, the enterprise: (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Defendants, along with other individuals and entities, including unknown third parties.

82.     Alternatively, each of the above-named entities constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the members of the enterprise conducted a pattern of racketeering activity. The separate legal statuses of the members of the Auto Insurance Enterprise facilitated the fraudulent scheme and provided a hoped-for shield from liability for Wells Fargo and its co-conspirators.

83.     The Auto Insurance Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systemic links for a single common purpose: to profit from unnecessary auto insurance policies folded into borrowers' auto loans.

84.     The members of the Auto Insurance Enterprise are systematically linked through contractual business arrangements, financial ties, and continuing coordination of activities. Since at least 2006, Wells Fargo and National General engaged in the following coordinated efforts to achieve the Auto Insurance Enterprise's goal ("the Auto Insurance Enterprise Scheme").  First, Wells Fargo signed up a customer for an auto loan.  Wells Fargo then sent the customer's information to National General, who purported to check a database for insurance coverage status.  Then National General notified Wells Fargo that the customer did not have the required coverage, and Wells Fargo added a CPI policy to the customer's loan without notifying the customer.

85.     Neither Wells Fargo nor National General could have accomplished the purpose of the Auto Insurance Enterprise without the assistance of the other and both profited financially from the scheme. National General profited as it underwrote each CPI policy and Wells Fargo profited as it earned commissions on each policy "sold" at least until 2013.

86.     There is regular communication between Wells Fargo and National General in which insurance and customer information is exchanged to facilitate the goals of the enterprise. Typically, this communication occurred, and continues to occur, using the wires and the mail.

87.     The members of the Auto Insurance Enterprise functioned as a continuing unit for the purposes of implementing the scheme, and each agreed to take actions to hide the existence of the scheme and the enterprise from others.

88.     Wells Fargo and National General participated in the conduct of the Auto Insurance Enterprise, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

89.     Wells Fargo and National General knowingly made material misstatements regarding:

    a)     whether a customer required a CPI policy;

    b)     whether a customer was required to pay monthly insurance premiums;

    c)     what steps Wells Fargo and/or National General would take to assess a customer's eligibility for a CPI policy and/or an auto loan;

    d)     the relationship between Wells Fargo and National General;

    e)     whether a consumer would be forced to enroll in a CPI policy;

    f)     the true terms and conditions of taking out a Wells Fargo auto loan; and

    g)     the true cost of taking out a Wells Fargo auto loan.

90.     Without these misrepresentations and consumers' reliance on them, the Auto Insurance Enterprise could not have achieved its common purpose.

91.     The Auto Insurance Enterprise engaged in and affected interstate commerce because, *inter alia*, it advertised, issued, and affected the price and terms of auto loans and/or insurance policies that were issued to and utilized by thousands of Class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico and required that Class members make monthly insurance payments on those policies in interstate commerce to Wells Fargo.

92.     The impacts of the Auto Insurance Enterprise are still felt today— *i.e.*, Wells Fargo and National General continue to force Wells Fargo auto loan customers to purchase and make payments pursuant to  CPI policies, whether they required under the terms of their loan or not.

**B.     Conduct of the Auto Insurance Enterprise**

93.     During the Class Period, Wells Fargo exerted control over the Auto Insurance Enterprise and participated in the operation or management of the affairs of the Auto Insurance Enterprise, directly or indirectly, in the following ways:

a)   Wells Fargo misrepresented the terms of its auto loans to its customers upon their initial application and throughout the application process;

b)   Wells Fargo transmitted loan applications and other customer information to National General;

c)   Wells Fargo misrepresented the role that National General played in the loan application process;

d)   Wells Fargo issued and/or authorized unnecessary or unauthorized CPI policies;

e)   Wells Fargo concealed the true nature of its relationship with National General from its customers:

f)   Wells Fargo paid and took payment from National General;

g)   Wells Fargo issued monthly statements to Class Members including fraudulent charges; and

h)   Wells Fargo collected monthly payments from Class Members for those charges.

94.     The Auto Insurance Enterprise has a hierarchical decision-making structure headed by Wells Fargo. Wells Fargo controlled the terms and cost of auto-loans it issued, determined who those loans would be issued to as well as when and if a customer's application and/or information would be sent to National General for review. Wells Fargo directed National General regarding its review of auto

loan policies and, ultimately, issued the CPI policies underwritten by National General and collected upon them.

95.     National General also participated in the conduct of the affairs of the Auto Insurance Enterprise, directly or indirectly, in the following ways:

a)   National General underwrote the CPI policies issued by Wells Fargo, with knowledge of Wells Fargo's fraudulent aim;

b)   National General reviewed auto loan applications with the aim of issuing CPI policies;

c)   National General paid commissions to Wells Fargo for each CPI placement;

d)   National General transmitted loan applications and other customer information to Wells Fargo;

e)   National General misrepresented its role in the loan application process;

f)   National General authorized the issuance of unnecessary or unauthorized CPI policies; and

g)   National General concealed the true nature of its relationship with Wells Fargo.

96.     Defendants also directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

**C.     Wells Fargo and National General's Pattern of Racketeering Activity**

97.     To carry out, or attempt to carry out, the scheme to defraud, Wells Fargo and National General did knowingly conduct or participate, directly or indirectly, in the affairs of the Auto Insurance Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

98.     Specifically, Defendants and their co-conspirators have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

99.     Wells Fargo's predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

(a) Mail Fraud: Wells Fargo and its co-conspirator National General violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to sell the CPI policies described herein by means of false pretenses, misrepresentations, promises, and omissions.

(b) Wire Fraud: Wells Fargo and its co-conspirator National General violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

100.    The pattern of racketeering activity by the Auto Insurance Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the Auto Insurance Enterprise's scheme. Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records.

101.    However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the Auto Insurance Enterprise's scheme, including the things and documents described above. Wells Fargo and National General's use of the mails and wires also includes, but is not limited to:

a)   marketing materials regarding Wells Fargo and/or National General's auto loans and insurance policies sent throughout the country by wire and mail;

b) mail and wire communications between Wells Fargo and National General establishing their relationship with respect to the Auto Insurance Enterprise and the issuance of auto loans and/or CPI policies;

c) the electronic or physical submission of auto loan applications and other customer material from Wells Fargo to National General for approval regarding CPI policies;

d) National General's written or electronic response to those applications and requests for information from Wells Fargo;

e) written, telephone, or electronic communications regarding and/or negotiating CPI premium rates;

f) the transmission and/or distribution of CPI policy documents through the mails;

g) the use of the mails or wires to bill for or collect revenues, and/or profits from CPI policies;

h) written and electronic communications to government agencies, including but not limited to the Office of the Insurance Commissioner regarding the CPI policies issued and underwritten by National General; and

i) the use of the mails or wires to communicate regarding the administration and conduct of the Auto Insurance Enterprise.

102.    Wells Fargo and National General also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, and other third-party entities in furtherance of the Auto Insurance Enterprise's scheme.

103.    Wells Fargo and National General knew, and intended that, Plaintiff and the members of the Class would rely on the material misrepresentations and omissions made by them and would incur increased costs as a result. Indeed, if Plaintiff and the Class did not make unnecessary payments for CPI policies, the Auto Insurance Enterprise's scheme could not succeed.

104.    Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Wells Fargo and National General intended to defraud Plaintiff, members of the Class, and other intended victims.

105.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and the Class.

106.    The mail and wire transmissions described herein were made in furtherance of the Auto Insurance Enterprise's scheme and common course of conduct designed to fraudulently extract revenue from and the Class.

107.    The pattern of racketeering activity alleged herein and the Auto Insurance Enterprise are separate and distinct from each other. Likewise, Wells Fargo and National General are distinct from the Auto Insurance Enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

108.    As described herein, Wells Fargo and National General engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiff and the Class through their misrepresentations and omissions, while providing unnecessary and unwanted CPI policies. The predicate acts also had the same or similar results, participants, victims, and methods of commission.

109.    Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate

18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

110.    Defendants, further, aided and abetted those unnamed entities in the violations of the above laws.

**D.    Damages Caused by Defendants' Auto Insurance Enterprise**

111.    By reason of, and as a result of, the conduct of Wells Fargo and National General and, in particular, their pattern of racketeering activity, Plaintiff and the Class have been injured in their business and/or property in multiple ways, including but not limited to paying unnecessary auto insurance premiums and interest.

112.    Wells Fargo's violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiff and the members of the Class who are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**
**Asserted on Behalf of Plaintiff and the Class**
**Conversion**

113.    Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

114.    Plaintiff and Class members own and have the right to possess the money that is in their checking, savings, and other accounts.

115.    Defendants interfered with Plaintiff's and Class members' possession of this money by wrongfully taking money directly from their accounts to cover fees for unnecessary insurance, as well as

1  for resulting costs and other penalties Defendants charged to Plaintiff and Class members on the basis of

2  these unnecessary insurance policies.

3      116.    Plaintiff and Class members never consented to Defendants taking money directly from

4  their accounts as a result of fees, costs, and other penalties related to unnecessary insurance policies.

5      117.    Defendants' wrongful taking of fees, costs, and other penalties from Plaintiff's and Class

6  members' accounts damaged Plaintiff and Class members in an amount that is capable of identification

7  through Defendants' records.

**FOURTH CAUSE OF ACTION**
**Asserted on Behalf of Plaintiff and the Class**
**Declaratory Relief**

118.    Plaintiff incorporates by reference every prior and subsequent allegation of this

Complaint as if fully restated here.

119.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual

controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other

legal relations of any interested party seeking such declaration, whether or not further relief is or could

be sought." 28 U.S.C. § 2201(a).

120.    As described above, this Court has jurisdiction over this matter, and therefore may

declare the rights of Plaintiff and the Class.

121.    Plaintiff and the Class therefore seek an order declaring that Wells Fargo's practice of

imposing unnecessary auto insurance policies on its auto loan customers is unlawful, that its practice of

failing to disclose such forced-placed auto insurance policies is unlawful, and that Wells Fargo is liable

to Plaintiff and the Class for damages caused by those practices.

**IX.    REQUEST FOR RELIEF**

Plaintiff, individually and on behalf of all others similarly situated, requests judgments against

Defendants as follows:

A.      For an order certifying the Class and, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), and appointing Plaintiff as representative of the Class and appointing the lawyers and law firm representing Plaintiff as counsel for the Class;

B.      Declaring Wells Fargo's actions to be unlawful;

C.      Permanently enjoining Wells Fargo from performing further unfair and unlawful acts as alleged herein;

D.      For all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Class, restitution and/or disgorgement of Wells Fargo's profits from its unfair and unlawful practices described above, and all other relief allowed under applicable law;

E.      For costs;

F.      For both pre-judgment and post-judgment interest on any amounts awarded;

G.      For appropriate injunctive relief, including public injunctive relief, i.e. an order compelling Wells Fargo to provide a full accounting of its CPI practices going back to 2006;

H.      For treble damages insofar as they are allowed by applicable laws;

I.      For appropriate individual relief as requested above;

J.      For payment of attorneys' fees and expert fees as may be allowable under applicable law; and

K.      For such other and further relief, including declaratory relief, as the Court may deem proper.

## X.      DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 31st day of July, 2017.          KELLER ROHRBACK L.L.P.


By */s/ Matthew J. Preusch*
    Matthew J. Preusch (Bar No. 298144)
    mpreusch@kellerrohrback.com
    801 Garden Street, Suite 301
    Santa Barbara, CA 93101
    Tel: (805) 456-1496
    Fax: (805) 456-1497

    Lynn Lincoln Sarko, *pro hac vice* forthcoming
    Derek W. Loeser, *pro hac vice* forthcoming
    Gretchen Freeman Cappio, *pro hac vice* forthcoming
    Alison S. Gaffney, *pro hac vice* forthcoming
    KELLER ROHRBACK L.L.P.
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101-3052
    Tel: (206) 623-1900
    Fax: (206) 623-3384
    lsarko@kellerrohrback.com
    dloeser@kellerrohrback.com
    gcappio@kellerrohrback.com
    agaffney@kellerrohrback.com

    ***Attorneys for Plaintiff***

4818-2869-6396, v. 1